Good morning, Your Honor. Good morning. My name is Edward Bryan. I'm the Assistant Federal Public Defender who it's my honor to represent Gezim Selgjekaj both at trial in this matter and on this appeal. There are two general assignments of error in this case. The first is a sufficiency of evidence argument that is raised. I'll touch upon that but I want to touch most of my focus this morning on the sentencing issues that are raised in this appeal. As was indicated in the briefs in this matter, this case involves the largest failure of a credit union in United States history, the St. Paul Croatian Credit Union in Cleveland, Ohio. Basically it was a credit union that was started a long time ago, a church credit union. It grew over the years. Most relevant for purposes of this case is what happened in basically its last ten years of existence. At that time, a gentleman by the name of Anthony Raguse, whose father was on the board at the credit union, became the credit union manager and he decided to start running the credit union like a commercial bank rather than like a credit union. He granted all sorts of loans that weren't permissible under credit union lending standards. Many of these loans went to individuals of Croatian descent. Many went to individuals of Albanian descent and other people from the Balkans area where most of the credit union members were from. Over time, when Anthony Raguse basically assumed responsibility for the credit union, its assets were about $30 million. In three years, he had raised those assets over $100 million. By the time that the credit union defaulted or fell into receivership, its value was up over $180 million. This is a unique case because there was a tremendous amount of fraud in this case. As it relates to the sufficiency of evidence argument, I think the reply brief says it best. That is that the fraud in this case wasn't necessarily frauds to induce the loans that were received on behalf of my client and myriad others. Others who weren't charged or prosecuted. But they were frauds to cover up Raguse's own conduct as it relates to trying to avoid scrutiny from auditors. Most importantly, the National Credit Union Association... Why is that so redeeming? It's still frauds. It's not financial institution fraud. The fraud that was being created in this case was, quite frankly, the St. Paul Credit Union's fraud against the National Credit Union Association through basically the person of Anthony Raguse. I stated in the reply brief what the government failed to do during the trial, although Raguse testified that, no, none of the board members knew anything about this even though the value of their credit union was skyrocketing from $30 million to $100 million in a three-year period of time. None of them knew about that. That's what Anthony Raguse testified to. But the government never called one witness from the credit union board to say, yeah, Anthony was making a lot of loans that we weren't approving of. The fact is, most of these loans were in businesses' names. My client's loans were all in businesses' names. If the board was overseeing the credit union at all, it would have realized that there were all sorts of commercial loans that were being created by Anthony Raguse as the credit union manager. And they were reaping the benefits of that because they were basically a credit union that was operating as a commercial bank. I don't understand the point of all this. As Judge Sutton said, fraud is fraud. Certainly your client was the beneficiary of it. It doesn't seem to be an incidental one to me. The victim was not Raguse. It was either the credit union itself or whoever insured it. That would be insurance fraud. The NCUA, the National Credit Union Association, was being defrauded by Anthony Raguse. The issue is my client's behavior. My client's behavior was, Mr. Raguse, can I have a loan? I want to use it to open a business or to run this business. It's the same for many of the people at the credit union. The client knew he couldn't pay it back, didn't have the money, didn't have really the assets to allow the size loans he was getting. Well, the government's own... So he knew what he was doing. No, my client made many efforts to pay it back. In fact, the government's own evidence indicated that he paid back between $400,000 and $500,000 in loan payments, the ones that they were willing to credit him for. His businesses actually created $16 million of deposits into his business accounts over a seven-year period, four years of which he was actually imprisoned on another matter. So these were legitimate operating businesses. They were generating income. He was paying money back to the... You can make a lot of money if you don't pay back your loans. I mean, he made only incidental payments on the interest and no payments on the principal whatsoever. Pretty easy to have a successful business when you run your business on credit and you don't pay the loans back. And I'm not suggesting that even the businesses were successful. You have to look at this from the perspective of my client, who's an immigrant from Albania and an asylum seeker, someone who started driving a delivery truck, started a trucking company basically with the assistance of Anthony Ragusa, an MBA-educated bank manager who was providing all these loans to these people. Okay. So just back to where we started here. You said you didn't really want to talk about sufficiency, which seems to me to be a good strategical decision on your part. You wanted to talk about the sentencing issues. I don't understand where everything you've been saying goes to the sentencing issue. It doesn't at all. In fact, I'd like to sort of segue my way into the sentencing arguments. The sentencing arguments are fairly clear. And even though these seem to be in a pellet sense of burdens that are difficult to overcome in most instances because the standards are abusive discretion and clearly erroneous, the record in this case does support that the judge was clearly erroneous as it relates to the loss calculations. I think the biggest loss and the difference here is $1.6 million. $1.6 million less, and the amount that was being disputed, would have put my client in an enhancement level of 18 levels as compared to. So the Ragusa testimony wouldn't have gotten you there? Well, I disagree with that because I thought it was only $10,000 or something he was going to talk about. No, no, no. It goes to the actual, the loan reconstructions is what sort of helped lead us to where the losses came. So we have multiple loan reconstructions. Basically, we had to go through every loan that was attributable to my client. And because of the way Ragusa did things, he would sometimes pay my client's debts out of other people's loans. And sometimes he would use debt he created in my client's name to pay other people's loans. So in the one instance I put in the brief is on one day, Anthony Ragusa created over $700,000 in debt in my client's name, and then paid $600,000 in bad loan payments to other people's loans. I mean, this is the type of accounting that we're dealing here with in this case. You've got to get down, what, below $9.5 million? Below $9.5 million. The judge said $10.6. The judge found $10.6. Now, you're not going to get there with the two out of the three of these loans that you're quibbling with, the $332 or the $227. You only win this, unless I misunderstand it, unless you win on the issue of the inclusion of these pre-indictment loans. That's true. Now, if there were simply a pre-indictment loan that was then never modified, changed, or anything else, it seems to me you'd have a pretty strong argument. But what the government is saying, as I understand it, is that yes, a couple of these loans originated pre-indictment period, but then they were, what the word is being used here, they were reset and rolled into new fraudulent loans. So I don't understand why they wouldn't be included as long as that reset occurred during the indictment period. That's the government's argument, but we have to go back to what my client was convicted of. He was convicted of financial institution fraud, and when he accrued $1,330,000 in loans pre-indictment, the government didn't present any evidence that those loans were the product of fraud. The fact that he still has a loan balance that then Anthony Raguse continues to roll into the later loans that are within the charging period doesn't change the quality of that evidence. And you can look at the other loans that Mr. Raguse granted during these time periods. Loans that the government knows weren't made pursuant to proper credit union lending standards, but loans nonetheless they chose not to prosecute. The perfect example is Frank Penevick, the gentleman who was my client's business partner, and that also goes to one of the arguments that loans paid for his attorneys to settle PACA claims were then used, were held against my client in the law. Hold on just a minute, just so I understand this. He takes out, is this $1,035,000, one loan or a series of loans? That's the loan balance on multiple loan accounts prior to the charging period in the indictment. Alright, now would I be correct in assuming that they were reset and rolled into new loans because they became due? They, well because they were still due, yes. They were what? They were loans that he was still responsible to pay on because they hadn't been paid. That's not what I'm asking. Were they due either because they then matured during the indictment period or they had gone into default during the indictment period even though they were not otherwise due because he didn't pay them and so therefore they accelerated the due date? No, and that's the problem with... So then why do you say they were rolled into other loans? That's, the things that you articulated as it related to default and accelerated the due date of the loans, things like that, that's not the way Anthony Raguse was running the credit union. That's the problem. But your problem it seems to me is the overwhelming evidence seems to be he didn't keep, he wasn't paying any of his loans. He wasn't keeping any of his loans current except in terms of this so-called loan kiting. So are you saying that there was evidence that he was actually paying on these $1,000,035, they didn't need to be rolled into new loans, everything was swell? Some of his loans were current, some of his loans weren't current and this was true of every credit union member that had commercial loans with the credit union. Anthony Raguse's concern... What is the standard that we employ to determine whether the judge was accurate in concluding that the $1,000,035 essentially became fraudulent because of what happened during the indictment period? There's no evidence... Is it clear error? Is it an abuses discretion? What is it? I think it's clearly erroneous because there was no evidence that that $1,000,035 was received through fraudulent inducements or through a scheme and artifice of the fraud. There's no evidence presented as it related to that. The mere fact that he still has a loan balance and I quite frankly I'm not sure how many people could pay off $1,000,035 in loans within a three-year period of time because most of those loans were first started to be received about three or four years prior to the indictment period. Quite frankly, they were just like my home mortgage. They were loans that still had outstanding balances on them but then they continued and a lot of the problem happened when... You're saying there's evidence in the record that he was current in whatever number of $1,000,035? No, there's evidence in the record that he was making loan payments but as it relates to... I didn't ask if he was making loan payments. Was he current on those loans at the time that they were rolled into new loans? Under proper accounting standards, probably not. Okay. If they weren't current, he wasn't paying them, then the bank was entitled to... In a normal bank, they simply would have accelerated the balance and defaulted them, right? Right. But in this case, they roll them into new loans that make it look like they're current. That's fraud. No, he's not the one who put them into the new loans. That's the whole point. Anthony Raguse is the one who's running the numbers here. He's the one who's controlling the loan activity. He's the one that's even making the loan payments. He might be the more culpable one. I guess that's... Well, I don't know what my client's doing to cause Anthony Raguse to do these things. In fact, Anthony Raguse... He's bribing them. Well, that's a separate crime. I'm talking about what is the receipt... I'm just responding when you say, we don't know why Anthony was doing what he was doing. Sure we know. Whether the conduct is charged in another account or not, we know he did it because your client bribed him. You know what? He did it for millions of other loans that he testified to weren't the product of bribes. That's the whole point. He was running the credit union like a commercial bank, he had plenty of loans that the government never prosecuted that weren't being paid back, and he hid those loans as well. He didn't do what a normal lender does. He didn't accelerate the loan. In fact, if he would have defaulted on the loan and accelerated, then my client's remedy could have been bankruptcy. And then if he had done that prior to the charging period, he wouldn't be held responsible for a million dollars in losses that weren't the product of his fraudulent conduct. I think we got the point. You'll get your full rebuttal. Thank you. From the government. Thank you. Good morning, your honors. Bridget Brennan on behalf of the United States. In this case, there was proof beyond a reasonable doubt that this defendant, while on county supervision, federal pretrial release for approximately four years of being incarcerated in a federal prison, and then on federal supervised release, conspired to and engaged in financial institution fraud and bribery. And that, using some of those proceeds, he laundered the money. After 27 counts of conviction at trial, the district court very carefully and correctly calculated the guideline range and then imposed a presumptively reasonable guideline sentence. It's been argued that this defendant was sort of a well-intentioned businessman who was victimized by Anthony Raguse. Well-intentioned businessmen don't pay bribes. They don't walk out of a credit union with north of $10.6 million and for years committing over and over to make payments only to see at the end of their scheme, as reflected in North of $77,000, which, as we all know, is more than the gross income most Americans make in an entire year. And he was committed to that. But what do we say, I mean, in terms of the sentencing, it's almost like he's treated like Raguse. I mean, he's clearly not the leader of this. You would agree with that, right? No. Well, Anthony Raguse's second question on direct examination, who is the most culpable person for this fraud, it's him. But he didn't act alone. That's really helpful that he doesn't say I was the most culpable. He did say that. Raguse said I'm the most culpable. Yeah, I'm the most culpable. Okay. Yeah. So you're agreeing with my point, that for purposes of sentencing, it seems very funny that given how culpable Raguse was, this fellow is treated as the leader of, you know, he's given all these management enhancements, doesn't that seem a little funny? Not when you look at the way the scheme breaks down. Anthony Raguse was absolutely the one inside the credit union, and he was the leader and organizer, and he got hit with that enhancement in his own sentencing. How long is his sentence relative to this guy's? I think he ended up with 14 years of incarceration, your honor. And this one is? 25. And the reason being, Anthony Raguse was never incarcerated. He has no criminal history, and he certainly wasn't engaging in this fraud while sitting in a federal prison or on supervised release. That would be the first difference. The second difference would be cooperation, acceptance of responsibility, and he didn't perjure himself at trial, which is all factors that this district court... I assume the main driver was cooperation. Yeah, I think I could concede that. I'm trying to remember specifically how his sentencing was argued, but I think the main driver would be cooperation, yes, your honor. And the lack of criminal history. I mean, the thing that said this defendant... Who? Mr. Sojekai? Yeah. He was an organizer and leader, and the reason that he was found to be an organizer and leader was based on the case law, you need five or more participants, he being one of them, and he has to organize or lead at least one other person. And the district court found, as a matter of fact, he organized and led Archer Hoxa and Jadmeer Kapoosh. In fact, the testimony at trial was... That he had to lead a few more, right? He doesn't have to lead... That's what I said. And then they have to lead a few more is what gets you to the numbers. Yes, your honor. Yes. And the district court found... Who were those others? The others would have been... Well, Anthony Raguse was part of that because Mr. Sojekai was directing when he wanted funds. He would ask for certain amounts. He was directing Raguse? When he wanted funds? Absolutely. He would call Anthony Raguse and say, I want $450,000. An example would be government's exhibit 1R. He submits... It's very funny to think of lieutenants managing and organizing generals. Well, you don't... A scheme can have more than one organizer or leader. When you look at... Let's say I don't buy that. Who else is a candidate to get you to five? Linda Federick and Debra Politi. And those were two of the tellers that were discussed throughout the trial. But Anthony Raguse explained that they were knowing participants in the resetting of defaulted loans, forging loan documentation. And with respect to Debra Politi in particular, Anthony Raguse explained that she had a unique relationship with the defendant. And the defendant would direct... The example would be Pamela Goldsmith. I don't know if you recall the testimony from her, but there was a truck loan she was trying to get for a startup business. Before she ever submitted any documentation to the credit union, the defendant told Ms. Goldsmith to go to the credit union and speak directly with Debra Politi that her loan had been approved. And then there were government's exhibits 67 to 71. And Anthony Raguse testified about those. But those were loan sheets that he would generate every month about what loans were about to be in default. And then the initials of those tellers would be alongside those loan resets, sort of indicating who was responsible for going in and resetting the loans to make the credit union look current. So that would be the five or more participants. And then another factor... Can we look at this this way when we're trying to figure out who's more or less culpable in all of this? If the transaction had been one where this fellow had taken out these loans and couldn't pay, and then the president wanted to cover that up to either show the board that he wasn't stupid for having made the loans, or he didn't want it to jeopardize the financial health of the institution, and he just kept rolling it over, you could make the argument that he was much more culpable. But this transaction is one where, even during this rollover period, the defendant is continuing to ask for and receive more loans that he wasn't otherwise entitled to get because of the fraud. Yes, sir. I mean, that's really your point here, isn't it? Absolutely. And it's all consistently reflected in the quarterly account statements. As Elizabeth Martin testified, those quarterly account statements matched perfectly with the credit union's general ledger. So all those numbers checked out. And every quarter, the defendant acknowledged he was receiving quarterly account statements. Every quarter it showed resets, and it showed these phantom payments being made to his whole empire of loans, and he continued to go in and get loan additions, additional loan money, and to make those payments. And he even explained this whole scheme to Archer Hoekse and recruited him to become part of the scheme with him. That was the testimony on that at trial, yes. So the defendant was not some unwitting or unknowing participant. He was constantly part of this game, forging documents, recruiting people to go into the credit union to sign for false loans. The defendant admitted he didn't make payments. Now there was a suggestion that the government didn't give him enough credit for payments, but that's actually not true. He got credit for cash payments. The only transaction that we got to in the argument of Mr. Bryan was this million dollars of pre-indictment loans. And he says those were legitimate loans and shouldn't have been included. He's paying on them, everything's fine, and that the fact that they got rolled over doesn't then make them fraudulent. So what do you say to that? Well, the district court clearly found that those loans were rolled in in order to keep this entire empire going and thriving and allow him to ultimately walk out with $10.6 million. But I would point out to your honors that... Why were they rolled over? Were they rolled over because they were in default? Because they were due? Why? Both, your honor. They were rolled over because they had to make this defendant look concurrent on his loans in order to explain why he would be getting additional loan proceeds from the credit union. You say the record shows that he was in fact in default on those loans when they were rolled over during the indictment period. Yes, he was not making payments, therefore they would have been in default. But again, part of the scheme was to rescue the default and to continually reset and pull interest into principle and reset these loans. But there's four categories of loans, four specific categories. Just so that I understand this correctly from back in my banking days, if they had actually as loans that were in jeopardy and that directly affected their capital ratio and he didn't have capital to support that level of really the loans that were in default. Am I right about that? That's absolutely right. And certainly the loan loss reserve would not have captured this loss amount. But I would point out... So the regulators would have swooped in, said either you've got to close down or you've got to come up with additional capital and he didn't want that to happen. Absolutely. And the defendant would have lost his income machine here. But with respect to Jimmy's trucking, $257,469, Anthony Raguse testified that the very first bribe he received from the defendant was in the creation of Jimmy's trucking. So that's a loan file that's entirely tainted by bribes. The $113,000 for RGV, never in operating... Let's assume that he bribed him to get a loan outside the indictment period. Now assume the indictment period was structured at least in part either by the evidence that you had or by the statute of limitations, correct? So he enters into a false transaction that's outside the statute of limitations. If he had kept that loan current and was paying on it during the indictment period, you couldn't count that, could you? No. We wouldn't have counted that. But that certainly wasn't the case in this instance. And relevant conduct allows us to go back and look at additional fraudulent transactions. RGV, never in operating entity. Top quality produce, which makes up $347,000 of that $1 million number. The very first loan for top quality produce was a kite loan. November 1st of 2002. When you look at that transaction, it was used to go and pay down the debt on all these other loans that the defendant wasn't actually paying on. And then the $316,000 for his personal account, same thing, your honor. It was rolled in and the district court found that with all four of those categories of loans that they were part of the scheme, properly considered as relevant conduct, and properly added into the loss calculation. Now there was also a reference made by counsel with respect to the PACA loans. And he said here, the PACA loan money was used to pay down Frank Panovic's attorneys. That's not true. And it's disproven by the evidence in the record in this case. Frank Panovic was represented by a gentleman by the name of Mr. Yarger. His law firm was Chesternet, Wasserman, Yarger, and Pasternak. And we have the letterhead from Mr. Yarger in the defendant's appendix. When you look at the PACA money, that transaction off of Jimmy's Trucking, that $279,000, when you go into the exhibit for that and you follow it the way Elizabeth Martin did during trial, that money was deposited into Jimmy's Trucking's share account and then immediately wired out to two different law firms, not Mr. Yarger's law firm. They were wired out to the law firms who represented the PACA suppliers. That money did not pay on Frank Panovic's attorneys. It paid PACA, which is exactly what the defendant wanted it to do. He sought and received two letters of credit for the PACA debt. He talked to Anthony Raguse from prison about paying for the PACA debt. And then he also talked to Arthur Hoekse and asked Hoekse to speak with Anthony Raguse about seeing that the PACA debt was covered. Mr. Hoekse, who was the defendant's attorney, as Anthony Raguse explained, Mr. Hoekse was the first person to come to Anthony Raguse and tell him about this PACA debt. What did Raguse test? He testifies during the trial but not at sentencing? That's correct. I don't understand why the government or, I mean, what was, why wouldn't you let him testify at sentencing if the defendant wanted him to? It's a fair point. And in Vujovic, a very similar instance came in that case as well, which is a sister credit union case. And the situation that the court has to consider is whether the district court abused its discretion in denying that writ. And the reason it did is because the information that Raguse would have sought, based on what the defendant was seeking, wasn't helpful or relevant. He wanted Raguse to explain the loan reconstructions. Raguse didn't create them, couldn't explain them. The witness for that was Elizabeth Martin. They didn't seek to bring her back. They could have. They argued about payments. He would have had some things to say about loan reconstruction if he was the head of the whole enterprise. No. He didn't. He did not recreate those loan reconstruction, John. He did not do that. That was a painstaking effort done by the NCOA down in Austin, Texas, most of the time while the defendant was incarcerated, or Raguse was incarcerated. So he wasn't privy to how those documents were created and he certainly didn't compare the loan documentation to the general ledger. Elizabeth Martin was the best person for that. They could have called her back. They didn't. They wanted Anthony Raguse. And the other thing they wanted him to explain were these sort of payments. And again, Governments Exhibit 1CC, page 2. Governments Exhibit 1DD, page 3. Governments Exhibit 13W. Those show the defendant making cash payments and them being recorded in those loan reconstructions. He got credit for those. One of the things he tries to say is he should get credit for deposits. There's a lot of talk about deposits. Even Seljeik I had to acknowledge. Deposits aren't payments. And when he says he had this whole legitimate business going and look at all the deposits that were being made, that's only one half of the balance sheet. The other half in Governments Exhibit 79 show that there were incredible expenses and those businesses were operating in the red. So this whole deposits and payments thing, it skews the analysis. The analysis is payments. Even the defendant, page ID 3501 said, I rarely made any payments. Deposits simply aren't the same thing. But he also wanted Raguse to come in and explain that the defendant wasn't part of these back door operations. Well, first of all, the defendant forged documents as we saw. Governments Exhibit 1R, he fraudulently induced loan proceeds to be made because he said he had to pay the IRS, but he got a Mercedes and he paid off his Florida federal court fees with it. But the fact that he wasn't behind the teller window was something the government elicited from Anthony Raguse at trial. There was no suggestion, no evidence, no argument made that Seljeik I was sitting behind that teller window. Thank you, Your Honor. At this time, I would just ask the court to affirm the district court. Thank you. Thank you very much. Mr. Bryan. Your Honors, I requested permission to exceed the word limit in this case because the facts are huge. And the facts are huge because of the conduct of Anthony Raguse. And everything that counsel has attributed to Anthony Raguse as it relates to Jimmy Seljeik, he did for everybody at the credit union, including myriad individuals who were never charged or indicted in this case, including Frank Pennevick, a man who had just failed as Mr. Seljeik's business partner, paid off millions of dollars' worth of PACA claims and the lawyer's fees related to those PACA claims, then set him up again in a new distributorship and a new produce distributorship, gave him $350,000 up front, a guy who had just failed in his business to start another business afresh. He was a witness for the government. He wasn't prosecuted. There was a gentleman who was a witness for the government by the name of Vladimir Rus. I keep trying to figure out why you're continuously telling us that there was other fraud going on. No. Relevant. According to the government, it was another fraud. That's the whole point. Yet what they're trying to claim is that these resets and things are a continuation of the fraud. That has nothing to do with Mr. Seljeik. That has to do with Mr. Raguse trying to cover his tracks with the NCUA, including loans that he made to Frank Pennevick, including loans that he made to Vladimir Rus, including loans that he made to myriad business people. The people on the default list are the people who were delinquent in their loans, included the tellers themselves, included other bank employees, included board members from the credit union. All of that is part of the record in this case. That's why I requested permission to exceed the page limitation. It's all in the briefs as well. It can be deciphered extremely well from the briefs what was going on here. Mr. Seljeik was an Albanian immigrant who was trying to live the American dream. He was asking for capital to start up businesses. You're going to get our attention a little better if you... I apologize. Let me get back to the sentencing. The three tellers that they used to meet the role in the offense, adding them to their criminal conduct, we wanted to call as witnesses during Mr. Seljeik's trial. We thought they were helpful to Mr. Seljeik to show that he didn't have knowledge of the backroom dealings of the pajama parties, that he wasn't privy to all of that, that that was what Mr. Raguse did along with his employees to cover his tracks with the NCUA. That's the amendment, isn't it? Yeah. Because the government didn't give them immunity, nor have they... They're not obligated to. Well, they may not be obligated to give them immunity, but they kept them in limbo. You've got to seriously... I apologize. You've got to really work on it. It's not helpful. I apologize. It's the trial lawyer. I apologize. Well, let me just tell you something. I think you care about your clients. If you care about your clients, you'll learn how to moderate that because you're not helping them. I apologize. But if they took the Fifth Amendment, they couldn't testify. Yes, but now the government wants to use them. They want to use them to enhance my client by another four levels for sentencing purposes. Why is the government precluded from using them because they invoke their Fifth Amendment rights? Why is the government precluded? Well, the government has the power here. They never did charge the tellers. We're two years now after the trial. They never did charge the tellers. But because they held them in limbo, I couldn't call the tellers as witnesses. And now, to add insult to injury, we're going to use the teller's conduct and attribute it to Mr. Seljecki in some way and enhance Mr. Seljecki's levels by another four levels? This is a significant increase under the guideline competition. I don't think there's a principle out there that you're not allowed to use people that you don't charge. I mean, that's actually not great for... That's not the point I'm trying to make. I'm trying to say that it was insufficient to use them as roles, as part of Mr. Seljecki's offense conduct, because he didn't control their offense conduct. He didn't control what they were doing. Anthony Braguse did. That's what the record was. And in our efforts to try to prove that fact wrong, even at trial, we're barred by the Fifth Amendment and the government's decisions not to charge. Mr. Seljecki was the last person to go to trial in this case. This case was pending for over five years before Mr. Seljecki went to trial. And the tellers were never... They were just sort of held in limbo that entire time, barred from us. And I'm not suggesting that they did anything illegal or wrong. It's what the law allows them to do. But I am suggesting it's wrong to now try to use their conduct on evidence that's insufficient. Five years was used to determine whether there was going to be plea bargaining and exactly how it was all going to work out. I understand all that. Now we're two years after the trial and they still haven't been charged. But I'm still missing it about these tellers. For the role in the offense, you've just got to say how many people were involved in that criminal activity. He only has to control one of them, and he clearly controlled the two people that work for him. The role in the offense adjustment doesn't turn on whether he actually controlled the two people. It turns on whether or not they were involved in his criminal activity, not in separate criminal activity related to trying to avoid from the NCUA. You know who else could have been a helpful witness as it related to the roles of the tellers? Anthony Raguse, the witness that the judge precluded us from allowing the call. He would have been... And it's not just a matter of these loan reconstructions. He knows what the loan amounts were for. Arter LLC, HAH Enterprises, Albany, Inc. Those are businesses that were associated with Arter Hoaxer exclusively. He testified at trial? He testified at trial. And were allowed to cross-examine him? As it related to guilt or innocence. I don't think it was strategically, but if I tried to get into every transaction as it was relevant for sentencing purposes as it related to loss calculations, it wouldn't have been relevant necessarily for guilt or innocence at trial. It might have been. And it could have been brought in sort of back door. Actually, it would have seemed really helpful to say Raguse when doing all this. I wasn't doing it. Well, I did. I encourage you to reread the cross-examination of Raguse because I think it was extremely... On this point, what Raguse did vis-a-vis the tellers and exactly how he was involved with the tellers and not your client. And that's part of the record. And another reason why... And that was cross-examined. Well, I think we can agree the jury didn't buy it, correctly or incorrectly. Well, I mean, we're talking about loss now. The jury had nothing to do with loss. I'm talking about... Back to your saying the question of whether this was all Raguse's dealings or doings or whether it was your client's doings. My client requested loans. Raguse granted the loan request. And the jury found that at least some of them were granted because your client bribed him. Well... I know you say he didn't, but that's what the jury found. And I didn't challenge the bribery for sufficiency either because the evidence was sufficient as a matter of law to find him guilty of bribery. I challenged the fraud for sufficiency because there's a tremendous amount of fraud here, but it doesn't go to defraud in the financial institution. It's quite frankly the financial institution... I think we understand both of your arguments. We really appreciate both briefs, the oral argument, Mr. Bryan, your passion, which we really appreciate. And all I'm just saying is sometimes we hear better when you slow it down a little. But don't worry about it. Don't worry about it. I apologize, Your Honor. I just... I understand. Mr. Seljecki got a quarter century sentence, which is 11 years longer than... All three of us have had clients before. We understand. But the point being is I never did get to my final argument, which is the substantively unreasonable aspect. That one we understand, and that one we've seen before. So we do know how that works. All right. Thanks to both of you. The case will be submitted. We're going to take a brief adjournment.